Good morning, Your Honors. Josephine Petrick for Plaintiff Appellant, Martifer-Silverado Fund I. I'd like to reserve five minutes for a rebuttal, please. This is the international Soledil fraud case in which the District Court granted summary judgment based on the statute of limitations. Summary judgment was erroneous twice over. First, with respect to the Wiedemann email, it did not put MS Fund, or a reasonable jury could find, that his email did not put MS Fund on notice of fraud regarding Eric Ma's authority for multiple reasons. Can I just pause there and ask about this? Because we have the Ma theory, but we have the general other part that the District Court granted judgment on the pleadings about, which is that the entire company Ma worked for is not valid. So unless you can challenge that, I don't understand how the Ma thing helps. Because if you know that the whole company is invalid, then Ma is invalid too, right? Because he just is part of that company. No, Your Honor. And I have two-pronged response to that. For one thing, the soothing reassurances applied to the entire transaction, not just with respect to Ma's authority. So you really have to convince us about all of it. I mean, it seems like you have to convince us about the company being valid. So starting with Ma logically doesn't make sense to me, because you've got to get past this idea that you knew that this company was a sham in order to get anywhere near Ma, I think. No, Your Honor. And second, these were separate misrepresentations. With respect to Ma, it was like a parachute that defendants were keeping in their pocket to get out of the transaction in the event of a dispute. But if you know that Saleson is not a functioning company that can enter contracts, then that subsumes Ma, doesn't it? No, Your Honor. And I do want to push back on the notion that MS Fund was on notice that Taliesin was not a functioning company. They had no idea that it was actually not a functioning company. Okay, well, we can talk about that for a second. But if – let's just assume for a second, just to figure out if there really are two separate claims here. If for a second we assume that you're going to lose on the judgment on pleadings issue, let's just – is there any way that that doesn't subsume Ma? Yes, because it was clear – and taking Your Honor's hypothetical at face value, that let's say MS Fund was on notice that maybe Taliesin USA was just a front. It was led to believe that the parents were funding – would be funding the transaction and that the transaction was going to go forward no matter what. So they were told during the Christmas call – they call it sometimes the Christmas massacre – that, oh, it's just a matter of, yeah, we're not going to pay on time. It's just a matter of getting the money out of China during the holiday. It's going to happen. Please go ahead. Pursue those information. Do you have an argument that you didn't really know that Taliesin was a sham? Like the parents were going to prop it up? Or is that somehow – I mean, do you have an argument that you thought Ma was actually representing – entering these contracts on behalf of the parent? So there was a lot of overlap in the executives. The parent company, or a company called Zhongli, was originally going to be the contracting party. About a week before the MIPA was due to be signed, the parents switched out the contracting party, said, you know, we're going to use our U.S. subsidiary. And there could be many reasons why a company would do that. A reasonable jury could find that had to do with making it simpler from a perspective of U.S. regulations. There were people on the ground that Eric Ma was based in the U.S. But throughout the transactions, the parents represented that both Eric Ma – that Eric Ma did have authority to pursue the transactions. And that's something that – But on behalf of Saleson, the U.S. company. Yes. So I just don't understand this. I don't understand how, if the Saleson is invalid, there could be any separate theory about Ma that would matter. Again, I would push back on the notion that the allegations about fraud, about fraudulent inducement, weren't that Taliesin USA was – they didn't know that Taliesin USA was just a shell company invalid from the outset, that they had notice at the outset. The idea is that Taliesin USA would be the signing party and that the deal as a whole would go through. And that's something that the parents hammered over and over again, including their counsel, as well as deal counsel for Taliesin USA. So can I break this down a little bit? Because you've talked about the Wiedemann email and you've talked about the so-called Christmas massacre, which is after the Wiedemann email, right? So the Christmas massacre, if you just focus on the Ma issue, the Eric Ma authority issue, the Christmas massacre is only relevant on this, what you refer to as soothing assurances, right? Because the district court held that the earlier thing is what triggered the statute running. So I want to focus on the Wiedemann email. Yes. So is it the date of the Wiedemann email, which is December the 13th or whatever, you've got two big things. They stopped paying on the contract, and there's an email that says Mr. Ma has been told that he has no authority. How is that not enough to start the clock running? Your Honor, the Wiedemann email is very ambiguous. But it's not ambiguous when they've stopped paying. Doesn't that put color on the email? I would push back on that because the Wiedemann email said, you know, going forward, Eric Ma is no longer going to be leading the transaction. It said it had been perceived that he was not behaving professionally, which Eric Ma, according to this email, denied. And it said going forward, anything that goes out, any signatures that go out with Eric Ma's signature have to be approved. And what the Superior Court found was that that was not the case. Right, but the going forward, that's going forward. They've already breached the contract at that point. And the quote from the email is that Eric did not have the authority to pursue the Silverado transaction, or something to that effect. And yet Eric Ma continued serving as the- They didn't start paying. I mean, we're not talking about is that enough for you to win the lawsuit. We're talking about if that's enough to start the clock running. Right, yes, and a reasonable jury could look at that email and say, maybe with hindsight, you know, the term authority was in that email. Maybe with hindsight, 2020- But then within weeks, the deal collapses. So how can you- it makes no sense. Well, it didn't entirely collapse. So putting the timeline in perspective, the Wiedemann email did cause- After the Wiedemann email happened, did you get any more money? That's when they asked for the call. I mean, yes or no, did you get any more money? No, the deposits occurred before that. Correct, so after the Wiedemann email, no more money was exchanged. The deal collapses within weeks. It did not collapse. So a reasonable jury could find that they then proceeded to enter into two more agreements. The standstill agreement- Which then collapsed. How long did it take for that one to collapse? Well, that one didn't collapse until the letter agreement, which was March of 2013. And even then, it wasn't clear- So three more months later. So putting it all together, within four months of this email, all the transactions collapsed, and you still didn't think something was wrong. No, the email, the way it was interpreted at the time was they're bringing new parties into- not parties, but they're bringing new people into the conversation. And it was enough for them to ask for a call in which the leadership from the parents and their attorney, Derek Dahlstrom, attended. And they reassured them, no problem, we're not going to- They never asked them, does Ma have the authority, right? No, because they thought that was a non-issue at the time. It seems like a failure of due diligence at that point. Well, the due diligence was asking for the call. And on the call, they were very reassured. A reasonable jury could find they were- I thought on that call, Ma was silent. That's true. So how was that reassuring? They were reassuring about the deal going forward. Oh, I see. And they said, we're not going to pay by the deadline, but rest assured, it's just an issue of getting the money out of China in a timely fashion. It's the holidays over there. Please go ahead and proceed with the interconnection agreements, which are quite expensive and require a large outlay. And rest assured, this is going to happen. We are committed to the deal. And that's representatives of the parents saying that. So if that's not a soothing reassurance, I don't know what is. And the point here is none of the cases that the parents cite- How was it reassured then that you didn't receive any money on Christmas? The Christmas massacre. Is that reassuring? Because they entered into a standstill agreement that would allow the parents and Taliesin USA more time to get the money over the border. So they did pay a total of one- You were constantly- Please. Never mind. Go ahead. Oh, no. Please, I want to hear. No, no. It just seems like you were constantly strung along, and then the next deadline passes, you were strung along again, and then the next deadline passes, you were strung along again. And at some point, you've got to realize, at some point, fraud is happening to you. And it can't be from six years later when something else happens. Well, they had no idea that they were going to pull out of their pocket, that Ma lacked authority for the entire transaction. That was a complete surprise and something that happened in 2019. And can I ask you what damage comes from this fraud that wasn't already recovered in the contract action? Yes. So some of that damage could potentially include the inability to see a profit from their- So because of the misconduct that occurred in this case, I'll just call it misconduct generally, not only were they deprived of the value of the contract, which is what was awarded in the contract action, that was $34 million, they also were forced to sell their entire portfolio in a fire sale because they had made all these outlays of cash to do the interconnection agreements and everything at the parent's request on that call, the Christmas call. And eventually they had to sell their entire portfolio, and this is all in the statement of decision, for a fire sale- Who was they here? Oh, MS Fund and Silverado had to sell their entire portfolio of solar projects, not only the remaining project companies, but also their entire portfolio to a hedge fund, who then turned around and sold the portfolio for, I think, $1.6 million. In the breach of contract case, I know there was a judgment. Did they collect any of it? They've collected approximately $9,000. $9,000? Okay. So are you trying to do this to collect that judgment? No. No, this is a separate action. Would it be the same damages, though? I mean, would you say we get the contract damages as part of this fraud? No. No. So I don't quite understand yet this fire sale. Can you explain again what you were just saying about what you think the fraud damages are? And I will just preface this by saying this was not part of the summary judgment argument, and so if this were remanded, we would obviously want to develop this more in the trial court. But the damages potentially, just so you know, it would not be futile to send this case to trial. The damages could include business consequential damages. For example, the damages they lost to their entire business as a result of relying on this fraud, and that included having to sell their entire portfolio of solar companies in a fire sale because they became bankrupt, essentially bankrupt as a result of the fraud, to a hedge fund. And the hedge fund, just to give you a sense of what the value of that was, was able to then turn around and sell those companies for north of the billion with the B dollars. And this is all in the trial court statement of decision. And it is well established that contract damages and fraud damages can proceed in separate claims and damages can proceed in separate actions. And, you know, going back to the- That can be true. It just seems like they're very related here. I mean, basically, you were fraudulently induced to enter a contract, and then you got the contract damages for the contract. So it's confusing how they don't overlap entirely in this case. I understand how- It is- There is a lot of overlap, and the record will be very similar in the witnesses. But the types of damages- You know, I would just categorize these as consequential damages, which they did not seek in the contract action, and they did not seek it in the contract action because they were barred by the contract. So they only sought the value of the contract. And going back to the point about notice, I understand the panel's concern that there was arguably notice that there was a breach of contract. But I would respectfully submit that a breach of contract, notice of a breach of contract does not ipso facto give rise to notice of fraud claims, that fraud was going on. And none of the cases that the parents have cited that have to do with contract damages set out any kind of categorical rule that, well, once you have notice of a breach of contract, then you have to investigate any potential fraud, including fraudulent inducement. That's just not how it works. What is wrong with the district court's reasoning about how the complaint itself pleads notice about the company being a fraud? Oh, I did want to- As a point of procedure, in the parents in their fourth brief on cross-appeal, page 7, footnote 1, they state, if this court resolves the judgment on the pleading, you know, wants to affirm the judgment on the pleadings, it does not need to reach summary judgment. That is incorrect as a point of procedure. U.S. Supreme Court in Ortiz against Johnson has stated that once- if the court denies an earlier dispositive motion, such as a motion to dismiss, in that case it was summary judgment, and then proceeds to a later stage in the case, the pleading- any arguable issues with the pleadings fall away, and the court looks to the facts as they were developed at the later stage. So it is not correct to say this court can solely look to the judgment on the pleadings and how it was pleaded- how fraud was pleaded with respect at least to Ma's authority. Okay, I'm not talking about Ma's authority. Tell me on the merits. What is wrong with the district court's evaluation that you had notice of the company being a fraud? This case is a lot messier than any of the other cases cited- that the parents cite. There were the soothing reassurances. There were the two subsequent agreements. The parties, at least the MS Fund, tried really, really hard to salvage this deal, and they were led to believe by express representations that the defendants- that the parents were attempting to salvage it as well. But unbeknownst to MS Fund, that was not true. They were stringing MS Fund along and essentially were reserving the right at the end of the day to say, well, those deals were never authorized anyway, even though there was a certificate of authority for Eric Ma and every other interaction they ever had confirmed that Ma did have authority. And so with respect to the earlier misrepresentations about Taliesin being the right party, Taliesin USA being the right party, Taliesin USA having enough autonomy and enough funding to be able to handle this deal on its own, that's all part and parcel of the same fraud with respect to- when you look in context and a jury at trial would look in context saying, well, what exactly happened? There are the soothing reassurances. There are the subsequent deals. And the California Supreme Court on Brown v. Bleiberg and Gutierrez's case and others has held that it is a question for the jury whether soothing reassurances restart the discovery clock. And we would submit that's exactly what happened here. If there are any more questions, I'd love to entertain them. Otherwise, I'll reserve the balance. Thank you. Good morning, Your Honor. My name is Elizabeth Pipkin on behalf of the appellees and cross-appellants. And may it please the Court. The District Court correctly dismissed this case in two stages. First, the Court granted the appellees' motion for judgment on the pleadings based on two categories of alleged misrepresentations. Those misrepresentations involved representations about Taliesin's ability to conduct business on its own and Taliesin's ability to perform under the agreements. The District Court correctly held that the First Amendment complaint amply demonstrates that by January of 2013, the Fund had numerous reasons to suspect that Taliesin USA could neither transact on its own nor perform its contractual obligations, notwithstanding representations to the contrary. And this included the allegations that Taliesin USA was strictly a marketing conduit, that it had to go back to the parents repeatedly throughout the transaction, that Taliesin USA was just a front face for the transaction, and multiple other allegations that the District Court relied upon in granting the motion for judgment on the pleadings. The District Court's order granting the motion for judgment on the pleadings is well supported by the First Amendment complaint. And MS Fund does not really explain why those allegations did not reflect notice in this case. Instead, as we just heard, MS Fund attempts to rely on the soothing reassurances doctrine. And there are three problems with this soothing reassurances argument with respect to the motion for judgment on the pleadings. The first problem is that MS Fund did not waive that argument in response to the motion for judgment on the pleadings, so that issue was waived. Second, the cases that MS Fund cites do not support the soothing reassurances argument. We have cited multiple Ninth Circuit cases in our brief that have rejected this argument in similar contexts. And the cases that MS Fund is relying on are really state court personal injury or medical malpractice cases where, for example, there's a patient who was not given information by their doctor about the nature of a surgery. This is a much different situation than what we have here, where we have two sophisticated commercial parties. And it was very clear from the outset, contracts are either performed or they're not. And these definitely were not performed from the get-go. So hang on a second. So you're saying soothing reassurances is not a thing, basically? Yes, Your Honor. So if after the Wiedemann email and after the Christmas massacre, the Chinese parent company had come in and said, Ma's fine, here's a letter saying he's got authority, doesn't matter, the statute of limitations would still be running? Is that your argument? Based on the cases that we have seen, yes, Your Honor. It would be kind of crazy, wouldn't it? Well, it may not seem just, but certainly there have been cases, and we've cited cases where counterparties or investment advisors or others have come back to a party and have said, oh, it's fine, don't worry, I'm handling it. And the courts have said, no, but you still knew, you got a letter that said. Okay, so let me go about this in a different way. So the whole idea of inquiry notice is that something is triggered and now you have to check. So does it have to be the case that if you had checked, you would have found out that the representation was false? There is a doctrine in the cases that says that if you checked and then people still told you it was false, then that could toll the statute. Yes, Your Honor. I don't know if I'm answering your question. I'm sorry. You just said that if you checked and they still told you it was false, that would stop the statute of limitations? That doesn't make sense. I'm sorry. I think I'm getting confused on this scenario. Basically, here we know that MS Fund did not actually check. Yeah, I know, but my question is, does it have to be the case that if they had checked, it would have put the lie to what they had been told before? I think it depends on the facts of the case, Your Honor. Here, we know that they didn't check, and that's what the district court relied on. Yeah, they didn't go out and do an affirmative investigation, but why isn't it enough in terms of due diligence that all of these other things happened after the fact? There's these e-mails going back and forth. There's the letter agreement. There's the standstill agreement. There's all this other stuff that's happening that is basically trying to get across the impression, no, the deal's still good. Let's keep working on the deal. Why isn't that enough? Whether you call it a soothing reassurance or something that would show that an investigation wouldn't have gotten anywhere. Because it wasn't soothing at all, Your Honor, based on the facts of this case. December 21st, we'd have an e-mail saying, Ma says he doesn't have authority. Christmas massacre, December 25th. Standstill agreement signed on December 31st. Ten days later, that agreement is breached. So we're having breaches and failures to pay within a matter of 20 days. That's why it's not enough. So basically, it's just kind of a series of failed promises, essentially, with nothing that would undercut the notice that they were put on. Exactly, Your Honor. Okay, thanks. And can I confirm, if we agree with you on the statute of limitations, we don't have to reach your cross-appeal issue? Yes, Your Honor. If the court could simply affirm the judgment as it was decided by the district court. Affirm the granting of the motion for judgment on the pleadings and the granting of the motion for summary judgment. Given that you're really just asking us to affirm in full, I don't understand why you filed a cross-appeal. And it was a protective cross-appeal, Your Honor, and certainly... It's really just alternate grounds for affirmance, and we've said lots of times that that's not a reason to file a cross-appeal. So I don't understand what you thought you were doing when you filed a cross-appeal. We cite cases in our opposition to the motion to dismiss the cross-appeal that talk about if there's a risk of reversal on one of the issues. But that's why you say in your brief, if you don't agree with that, here's the alternative reason. Understood, Your Honor. And maybe we made the wrong call there, and I apologize if we did. It seems like maybe we should strike your fourth brief. Like, you got an extra brief because of this, and it doesn't seem like it was a proper move. Is that appropriate? Your Honor, in our opposition to the motion to dismiss the cross-appeal, we outlined where we believed the cross-appeal was appropriate, and I would stand on the brief that we filed. It did seem like that last brief was mostly dealing with the main issue rather than the cross-appeal, so... Okay. Because that last brief should only be focused on the sole issue. And I thought we tried to focus it on the cross-appeal, but again, I apologize. But this is part of the problem, though, that the cross-appeal isn't really a cross-appeal. It's all the same issue, so there doesn't need to be a cross-appeal. And I apologize, Your Honors, if we did this incorrectly. Certainly don't want to waste the Court's time with unnecessary additional briefing. We feel good about the briefs we submitted, and if the Court did not find the fourth brief helpful and focused on the issues it needed to be, I will certainly own that and obviously defer to the Court's ruling on that. I think... With respect, I wanted to circle back briefly to the MJP issue, I believe, unless the Court has other questions. No. Okay. In our briefs, we cited cases in which similar situations where there were breaches like this also gave a party notice of fraud claims, such as the Vera case and the Choi case. So we think it is appropriate for the Court to hold that based on the District Court's ruling on the motion for judgment on the pleadings, this case would have been correctly dismissed at the pleading stage. Thank you, Your Honors. Thank you. We still have some time for rebuttal. I'm sorry, Your Honors. Do I need to address the damages questions that Judge Friedland asked? I don't think so. Okay, thank you. Thank you. In the judgment on the pleadings issue, there's an argument made by the other side in their brief that it was waived. You didn't argue the two things that the judge pitched at that point and therefore that point's waived. Do you want to address that? That's correct, Your Honor. The soothing reassurances was not argued in connection with the MGOP issue, but we are submitting that because it was preserved and is squarely before this Court with respect to the MSJ, the same question of law applies with respect to the other allegations in the MGOP. Even though you didn't argue it? Yes, Your Honor. Okay. I was not trial counsel, but I think there were a lot of issues. You know, a lot of things happen in the trial court that there were a lot of moving parts with respect to the MGOP. At the end of the day, this Court should not hold, even if it affirms that aspect of the judgment on the pleadings, it should not hold that notice against the plaintiffs here just on the ground of waiver, especially where here the soothing reassurances argument was preserved. There's nothing that lives... You're talking about the initial triggering issue. I mean, the other side says in their brief, it's page 28 of their brief, that your opposition to the motion for judgment on the pleadings only addressed the alleged representation regarding Mr. Ma's authority and didn't address the other one. Is that right or is that not right? Oh, I see what you're saying. Yeah, so even assuming they're correct and arguing that those allegations of fraud were no longer in play in the district court, whether it's because of the MGOP ruling or because of the briefing leading up to it, this Court can still look separately at the Ma allegations. So in other words, you don't have an argument to get around that waiver? No, Your Honor. Okay. But the same soothing reassurances would apply... Well, you know, we already talked about this in the opening. But I do want to make a couple other points. In response to Judge Kennelly's question to my friend on the other side, if MS Fund had checked, is it required that they would have found something? This is addressed in the California Court of Appeals opinion in Syme v. Maloof, which is in the briefs 95, Caleb II, 82, Penn site 106-107, where the Court... ...said that to prevail on a summary judgment motion, the defendant must show, as a matter of law, that avenues of inquiry were open to plaintiffs and, if explored, would have revealed the fraud. And this is a question of fact. Here, a reasonable jury could find that MS Fund did try to get to the bottom of whether these transactions were going to go forward, whether there was going to be a problem as presaged in the Wiedemann email. And they took that call with the parents' representatives. They did do inquiry. It seems like your better argument might have been that, even if we had asked, they would have lied to us because they were trying to hide this, and so the second part wouldn't be satisfied. But I don't really think you made that argument. Am I right? No, but I think that's certainly a fair inference from the fact... I mean, they didn't think... Their argument was, which is the testimony is, they didn't think the Ma issue... They didn't think Ma's authority was an issue. They didn't view it from that lens whatsoever because of the Wiedemann email. What they were concerned with is, there are new people being brought in at this stage. We need to check in with them and see what happened. And it was on the Christmas call, subsequent to the Wiedemann email, that the payment was missed, not before. And it was during that call when the parents said, we're not going to pay timely, but we promise it's coming. That's quintessential soothing reassurance. There's nothing that limits soothing reassurances to personal injury cases. It's a summary judgment standard. So we've taken you over your time. Thank you, counsel. Thank you both sides for the helpful arguments. This case is submitted.
judges: FRIEDLAND, BUMATAY, Kennelly